BETTY M. SHUMENER (Bar No. 137220)
bshumener@soollp.com
STACI M. TOMITA (Bar No. 266309)
stomita@soollp.com
BENJAMIN L. HICKS (Bar No. 312765)
bhicks@soollp.com
**SHUMENER, ODSON & OH LLP**
550 South Hope Street
Suite 1050
Los Angeles, CA 90071
Tel: 213.344.4200
Fax: 213.344.4190

Attorneys for Plaintiff Halsey Minor

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALSEY MINOR, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BILL LAGGNER, an individual; DAVID BECHTEL, an individual; and OUTPOST CAPITAL MANAGEMENT, LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. 2:18-CV-00731 PA(KSx)<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>**(1) RESCISSION - FRAUDULENT INDUCEMENT**<br><br>**(2) RESCISSION – FAILURE OF CONDITION PRECEDENT**<br><br>**(3) RESCISSION – UNCONSCIONABILITY**<br><br>**(4) FRAUD AND FRAUDULENT CONCEALMENT**<br><br>**(5) BREACH OF CONTRACT (RESCISSION/DAMAGES)**<br><br>**(6) DECLARATORY JUDGMENT**<br><br>**(DEMAND FOR JURY TRIAL)** |

FOURTH AMENDED COMPLAINT

FAC000001

SHUMENER, ODSON & OH LLP

Plaintiff Halsey Minor ("**Plaintiff**" or "**Minor**") hereby alleges as follows:

### JURISDICTION AND VENUE

1.      The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1332(a)(1), diversity jurisdiction.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Plaintiff Halsey Minor is an individual who is domiciled in the State of California and is a citizen thereof and of the United States.  Minor is informed and believes, and on that basis alleges, the following: (i) defendant Bill Laggner is an individual who is domiciled in the State of Texas, and is a citizen thereof and of the United States; (ii) defendant Outpost Capital Management, LLC is a Delaware limited liability company which has its principal place of business in the State of Connecticut, and (iii) the sole members of defendant Outpost Capital Management, LLC are two individuals who are domiciled in the State of Connecticut, and are citizens thereof and of the United States.

3.      Venue is proper in the Central District of California because Minor resides in the State of California and within the District, and many of the events and/or omissions giving rise to the claims occurred within the District.

### THE PARTIES

4.      Plaintiff Halsey Minor is an individual who is domiciled in the County of Los Angeles, State of California, and is a citizen of the State of California and of the United States.

5.      Minor is informed and believes and, on that basis alleges, that defendant Bill Laggner ("**Laggner**") is an individual who is domiciled in the State of Texas and is a citizen of the State of Texas and of the United States.

6.      Minor is informed and believes and, on that basis alleges, that defendant Outpost Capital Management, LLC (**"OCM"**) is a limited liability

SHUMENER, ODSON &
OH, LLP

-2-

FOURTH AMENDED COMPLAINT

FAC000002

company organized under the laws of the State of Delaware and has its principal place of business in the State of Connecticut.  Minor is further informed and believes, and on that basis further alleges, that OCM has only two members, each of whom is an individual who is domiciled in the State of Connecticut and is a citizen of the State of Connecticut and of the United States.

## **GENERAL ALLEGATIONS**

7.      This case is about the fraudulent scheme perpetrated by defendants Bill Laggner (**"Laggner"**) and Outpost Capital Management, LLC (**"OCM"**) to strip plaintiff Halsey Minor (**"Minor"**) of millions of dollars' worth of shares, in addition to his shareholder votes, in BitReserve, Ltd. (aka Uphold, Ltd.) (the **"Company"**) – a visionary company that Minor founded.

8.      Prior to the events leading to this litigation, Minor was the largest shareholder of the Company.  In the summer of 2016, the Company was in urgent need of financing.  Aware of the Company's vulnerable position, one of the Company's shareholders, Ricardo Salinas (**"Salinas"**), made at least two predatory loan proposals, each of which would essentially allow Salinas to take over the Company.  It was obvious from the egregious terms of his proposals that Salinas wanted to steal the Company at a ridiculous discount and at great cost to the shareholders.

9.      During that time, Salinas offered the Company financing that would require Minor to sacrifice 30% of his 44% stake in the Company and leave him with 14%.  (Ex. Z).  Minor rejected that offer, after which Salinas made at least one more offer.  Around the same time, the Company – headed by at least one person openly working for Salinas (Adrian Steckel) – cut Minor off from access to his Company email account, calendar and files.  (Ex. AA).

10.     Also around the same time, defendants Laggner and OCM, through its Managing Member, David Bechtel (**"Bechtel"**), approached Minor with an offer of

FOURTH AMENDED COMPLAINT

third party financing for the Company that was materially more favorable than **any** loan or financing negotiated between Salinas and the Company (the "**Salinas Loan**").  Laggner was a member of the Company's Board of Directors (**"Board"**), along with Steckel, and Bechtel was a shareholder.

11.     Whenever an action or communication is attributed to OCM in this Fourth Amended Complaint, it is an action taken by Bechtel or communication to or from him.  In addition, the acts of OCM are attributable to Laggner, and the acts of Laggner are attributable to OCM, as they were engaged in a joint venture and/or conspiracy with respect to the acts alleged herein.

### OCM and Laggner Formed A Conspiracy and/or Joint Venture

12.     From approximately June 23, 2016 through June 26, 2016, OCM and Laggner solicited Minor in California and represented to Minor, via telephone calls and emails, (i) that they did not believe the Salinas Loan (i.e., **any** financing negotiated between Salinas and the Company) would benefit the Company, given, among other things, Salinas' predatory practices; (ii) that they would work together on Minor's behalf to avoid the Salinas Loan; and (iii) that they had secured third party financing for the Company that was viable and materially more favorable than the Salinas Loan.  All of these representations were false, and Defendants knew it.

13.     Unbeknownst to Minor, in June 2016, each of OCM and Laggner knowingly and willfully agreed and combined to engage in a conspiracy to defraud Minor with the intent to steal millions of dollars' worth of his shares (comprising 14% of the Company), in addition to his shareholder vote, for $1.  In furtherance of their conspiracy, OCM and Laggner agreed to and did (i) represent to Minor that they had secured financing that would ensure the Company could avoid the unfavorable and drastic Salinas Loan (when in fact they never secured such financing); (ii) draft a purposely vague "contract" that (A) required Minor to transfer millions of his shares in the Company to them upon the occurrence of the

-4-

FOURTH AMENDED COMPLAINT

FAC000004

Company's "next financing" (which they knew Minor understood to mean a viable financing *alternative* to the Salinas Loan that OCM and Laggner would bring to the Company), and (B) required Minor to vote his shares in accordance with the vote of the majority of the Board until a qualified permanent financing was raised; and (iii) urge Minor to sign the "contract" immediately, claiming that they needed to present the secured financing alternative to the Company's Board that day (even though, on information and belief, it was not presented that day).  After the Alleged Contract was signed, OCM and Laggner agreed to and did promise Minor that they would continue to work on the alternative to the Salinas Loan (misleading him to believe that he did not need to hire anyone else to do so), when they were actually pushing the Salinas Loan to approval behind his back – purportedly negotiating in favor of the Salinas Loan and voting in favor of the Salinas Loan.  Once the Board (with Laggner's vote) approved the Salinas Loan, each of OCM and Laggner agreed to and did demand that Minor transfer millions of dollars' worth of his shares in the Company for $1, falsely claiming that was the deal from the beginning – no matter how unconscionable.

14.    In the alternative to a conspiracy, OCM and Laggner had a joint venture relationship.  As evidenced by, *inter alia*, their emails, the White Knight Term Sheet (defined below) and the Alleged Contract (defined below), OCM and Laggner agreed to work together in a joint venture to secure and formalize a financing alternative to the Salinas Loan acceptable to the Board, with a joint interest in earning Minor's shares, an understanding to share profits and losses because they would only get compensated through Minor's shares if they secured Board approval of such financing, mutual control over the enterprise, and mutual contributions in the form of services to raise said financing and convince the Board to approve it.

15.    Also evidenced by, *inter alia*, their emails, the White Knight Term Sheet (defined below) and the Alleged Contract (defined below), Laggner and

1   OCM agreed to act as Minor's loan brokers and agents.  Accordingly, Minor placed
2   his trust and confidence in them and relied on them to keep him informed as to,
3   among other things, the status of their financing, their supposed presentations to the
4   Board, the negotiations they engaged in, any financing proposals being made to the
5   Board, and the Board's position and/or votes on any financing proposals.
6          16.    To be clear, Minor is not suing Defendants for failing to secure Board
7   approval of a financing alternative to the Salinas Loan.  Although Board approval
8   was a condition precedent to the transfer of Minor's shares under the Alleged
9   Contract, everyone, including Minor, understood that the Board had a fiduciary
10  duty to its shareholders to choose a financing option most favorable to the
11  Company and its shareholders.  Board approval was not a promise that Defendants
12  made to Minor, but rather a prerequisite to Defendants' entitlement to Minor's
13  shares.  The promise that Defendants made to Minor was to secure and formalize
14  (e.g., structure, monitor, handle capital formation, document) an alternative to the
15  Salinas Loan.  Minor and Defendants knew that the terms of the financing that
16  Defendants represented to have secured – i.e., the White Knight Term Sheet – were
17  so greatly superior to the terms of the Salinas Loan that the Board, acting in
18  accordance with its fiduciary duties to the shareholders (and assuming both offers
19  were equally credible), would have no choice but to accept Defendants' purported
20  financing, but the parties also understood that the Board certainly could have
21  rejected said financing.  It was also the parties' intent that if the Board decided to
22  reject Defendants' purported financing, Defendants would not be entitled to
23  Minor's shares.  This understanding is in line with Defendants' role as brokers
24  (e.g., as brokers typically work on finding and structuring a deal but get
25  compensated only if and when that deal actually closes – a condition precedent not
26  in their control); it is also reflected in the parties' correspondence around the time
27  of the Alleged Contract.  (Exs. A-C, F-H, L-M, O-Y.)
28

SHUMENER, ODSON &
OH, LLP

FOURTH AMENDED COMPLAINT

FAC000006

17.    In reality, Defendants never secured a viable financing alternative and never intended to do so. Defendants' representations to Minor were false and were intended to con Minor out of 14% of the Company in addition to his voting rights so that Minor would no longer have a voice in the Company – a company that he had the vision to start and a company that he funded at the outset.

18.    Defendants represented that they had secured third party financing for the Company that was viable and materially more favorable than the Salinas Loan and that they needed Minor to sign the Alleged Contract immediately, hoping that Minor would gloss over the Alleged Contract and sign it even though it was vague. In reliance on Defendants' representations, Minor signed the Alleged Contract. Thereafter, Defendants represented that they would continue to work on an alternative to the Salinas Loan so that Minor would not have to do so, all the while pushing the Salinas Loan to approval, hoping to detract Minor from searching for the financing himself. In reliance on Defendants' representations, Minor was lulled into a state of inaction, as there was no need for him to hire someone else to do the work that Defendants had offered and agreed to do. Defendants actively concealed from Minor that they purportedly negotiated the Salinas Loan, that a Board vote on the Salinas Loan was happening, and that Laggner voted in favor of the Salinas Loan, hoping that the Salinas Loan would get approved without Minor's interference. Minor, not knowing these facts, did not have an opportunity to stop the Salinas Loan from being approved, and by the time he learned these facts, his efforts to avoid the Salinas Loan were as ineffectual as Defendants had hoped and planned for them to be.

19.    Thus, OCM and Laggner's conduct caused Minor to sign the Alleged Contract, even though it was vague as to "next financing", deprived Minor of the opportunity to personally seek or to hire someone else to seek a viable alternative to the Salinas Loan, and deprived Minor of the opportunity to stop the Salinas Loan.

SHUMENER, ODSON &
OH, LLP

FOURTH AMENDED COMPLAINT

FAC000007

As a result, the Salinas Loan was approved, diluting Minor's shares by fifty percent (50%) and shifting control of the Company to Salinas.  (Exs. W-Y).

20.    The dilution of Minor's shares arose naturally from Defendants' breaches of the Alleged Contract, which were acts part and parcel of Defendants' fraudulent scheme.  By failing to secure a viable alternative to the Salinas Loan and, instead, purportedly negotiating the Salinas Loan and voting in favor of the Salinas Loan behind Minor's back, Laggner and OCM could have reasonably foreseen the significant dilution of Minor's shares at the time the Alleged Contract was made.  The dilution was a *direct result* of Laggner and OCM's breaches. Defendants did not promise that the Company would never accept the Salinas Loan or that they would insure Minor against dilution, but they did promise to secure and formalize a viable financing *alternative* to the Salinas Loan.  Instead, Defendants took no efforts to secure such financing and actually advocated for the Salinas Loan behind Minor's back.  As a direct and predictable result of Defendants' actions and inactions, Minor suffered monetary loss because his shares were diluted by fifty percent (50%).  Unlike the preferred shareholders, Minor – a common shareholder – was not offered an opportunity to avoid dilution.  The common shareholders, who made up more than half of the Company at the time, were left in the dark regarding the Salinas Loan and were excluded from participation in the Salinas Loan.

21.    Even more nefarious was Defendants' intent to strip Minor of control of and access to the Company.  As explained further below, the Board's passage of the Salinas Loan effectively deprived Minor of his vote – i.e., through the Alleged Contract, which should be rescinded.

22.    Had Minor known that OCM and Laggner did not have a viable financing alternative to the Salinas Loan in June 2016, he never would have signed the Alleged Contract.  Had Minor known that Defendants were not actually continuing to work on such financing thereafter, he would have hired someone else to do so or would have sought such financing himself, and, on information and

-8-

FAC000008

belief, would have raised financing on terms superior to the Salinas Loan.  And had Minor known that Defendants were going to push the Salinas Loan to approval, he never would have agreed to sacrifice his vote.

**OCM and Laggner Fraudulently Induce Minor to Enter the Alleged Contract**

23.    On June 23, 2016, Laggner – on behalf of himself and OCM –sent an email to Minor, copying OCM, stating:

> Halsey, Just spoke with Dave[1] and **we'd** like to propose a **counter to Salinas** at 6:30 PT today.  Let **us** know if you're available and **we** can call you to discuss.

Minor responded, "Let me know when and I will make myself available", to which Laggner wrote, "OK, **Dave and I** will call you at 6:30 PT today."  (Ex. A, emphasis added).

24.    During the parties' June 23, 2016 telephone call, both Laggner and OCM represented to Minor that they had secured third party financing for the Company with terms far superior to the Salinas Loan, including but not limited to a smaller bridge loan to give the Company time to raise permanent financing favorable to the shareholders (with a significantly greater pre-money valuation than the Salinas Loan), little to no dilution to the shareholders, and less Company control handed over to investors.  Laggner and OCM's terms also required a vote of the shareholders – not just the Board – before permanent financing could be approved.

25.    Thus, on June 24, 2016, OCM – on behalf of both OCM and Laggner – sent an email to Minor, with a copy to Laggner, stating:

---

[1] "Dave" refers to David Bechtel of OCM.

1

2          Attached is a draft bridge financing term sheet on which

3          I'd welcome your feedback.  If **Bill and I** are going to

4          bring all of this together – structuring, reputation, ongoing

5          monitoring, capital formation – **to avoid a Salinas putch**

6          (sic), the way **we** proposed proceeding is with an

7          agreement that (i) **each of us** purchase from you for

8          nominal consideration 7% of the company's fully-diluted

9          common shares (7 x 2 – 14%), which should leave you

10         with 30% of the common, and (ii) you are on board with

11         the provisions of the Voting Agreement section of the

12         attached term sheet.  What is left unsaid in the TS is that

13         **Bill and I** would like you to be one of our Board

14         appointees going forward.

15

16  (Ex. B, emphasis added).

17         26.    Consistent with OCM and Laggner's assurances that they had

18  investors lined up and committed for their financing offer, on June 25, 2016, OCM

19  emailed a revision of the bridge financing term sheet to Minor and Laggner, with a

20  note that they "need to consider near term in naming the investor group in this

21  [Term Sheet] as a defined entity" before presenting it to the Company for approval.

22  (Ex. C).

23         27.    Laggner and OCM's term sheet, titled "Uphold Investment

24  Opportunity White Knight Bridge Financing Summary of Terms" (**"White Knight**

25  **Term Sheet"**), reflected a small bridge loan, which would give the Company time

26  to raise reasonable permanent financing instead of being forced to accept predatory

27  terms (like the Salinas Loan) under duress.  The White Knight Term Sheet

28  contemplated future permanent financing and included certain requirements for

SHUMENER, ODSON &
OH, LLP

1   such financing; it defined "Qualified Financing" as "A non-participating preferred
2   or common stock capital raise by the company in the minimum amount of **$15mm**
3   **at a pre-money fully-diluted valuation of at least $85mm**" and required OCM
4   and Laggner's consent before any indebtedness not meeting those parameters could
5   be incurred by the Company:

7           Uphold will not without the consent of the Instrument
8           holders' Representatives:  incur additional indebtedness,
9           contract liabilities, or liens; issue additional shares,
10          warrants, or options thereon, **unless part of a Qualified**
11          **Financing**; sell any assets

13  (Ex. C, emphasis added).  OCM and Bearing Asset Management, Laggner's
14  company, were the designated "Representatives" in the White Knight Term Sheet.

15          28.     In addition, consistent with Laggner and OCM's prior representation
16  that their financing would require a shareholder vote before any permanent
17  financing could be approved, their White Knight Term Sheet states:

19          Voting Agreement[:]  Uphold acknowledges and approves
20          the voting agreement between the Instrument holders and
21          Halsey Minor wherein Mr. Minor agrees to vote his
22          shares according to the vote cast by the Instrument
23          holders acting as a class.

25  (Ex. C).

26          29.     Consistent with Laggner and OCM's representation that they wanted
27  Minor to be a Board appointee under their financing offer, their White Knight Term
28  Sheet gave the "Participating Preferred…the right to appoint a Board majority until

1   such time as the Loan has been repaid in full and a Qualified Financing has

2   occurred, after which time it will appoint 2/5ths of the Directors".  (Ex. C).

3        30.    Each of Laggner, OCM, and Minor understood that the financing

4   terms prepared by Laggner and OCM were so greatly superior to the Salinas Loan

5   terms on the table that the Board, acting in accordance with their fiduciary duties to

6   the shareholders (and assuming both offers were equally credible), would have no

7   choice but to accept Laggner and OCM's financing.

8        31.    Laggner – a member of the Board – also told Minor, during a

9   telephone call between June 23, 2016 and June 26, 2016, that he would keep Minor

10  apprised of any financing proposals being considered by the Board.

11       32.    Laggner also repeatedly stated that he did not believe the Salinas Loan

12  (i.e., **any** financing negotiated between Salinas and the Company) would benefit the

13  Company, given, among other things, Salinas' predatory practices.

14       33.    On June 25, 2016, Minor sent an email to Laggner and OCM, stating:

15

16           By the way salinas as an investor has delivered on

17           nothing!  They have not done anything with us other

18           [than] promise and then waste enormous amounts of

19           executive time and money.

20

21           Everything they promised to do to help they have NOT

22           done.  As an investor in my opinion they earn an objective

23           F.  Contributing nothing valuable, only trying to steal

24           something of value at a weak moment.

25

26  (Ex. D).  In response, Laggner stated, "Agreed".  Id.

27       34.    On June 26, 2016, Laggner sent Minor an email forwarding

28  information about Salinas' predatory practices, including a case study regarding

SHUMENER, ODSON &
OH, LLP

-12-

FOURTH AMENDED COMPLAINT

FAC000012

1   charges against Salinas for "[o]bfuscating a privileged purchase of debt to enable

2   short term profits of $218 MM at the expense of shareholders."  (Ex. E).

3        35.    In reliance on Laggner and OCM's material representations, Minor

4   agreed that if the Board approved their financing, *in the place and stead of the*

5   *Salinas Loan*, Minor would convey to each of them 4,843,890 shares of common

6   stock that Minor held in the Company for payment of $1.00 from each of Laggner

7   and OCM.

8        36.    On June 26, 2016, Laggner and OCM sent Minor a document titled

9   "Stock Purchase, Transfer, & Voting Agreement" of the same date (the "**Alleged**

10  **Contract**"), which Laggner and OCM had prepared.  The Alleged Contract states,

11  in part:

12

13        **SALE AND PURCHASE OF SHARES**.  …The closing

14        of the transactions contemplated hereby shall take place at

15        the same time after the Effective Date as when BitReserve

16        Ltd.'s Board approves such company's next financing

17        (the "Approval Date"), and on the Approval Date, Seller

18        shall transfer and assign the Shares to Purchasers….

19

20        **VOTING OF SHARES**.  Seller agrees to vote his and

21        any of his affiliates remaining shares in BitReserve Ltd.

22        according to the vote recommended by the majority of the

23        Board of Directors of BitReserve, Ltd. until such time as

24        BitReserve has completed a **financing raising at least**

25        **$15mm at a pre-money valuation in excess of $85mm**.

26

27  (Ex. F, emphasis added).  Thus, just like Laggner and OCM's White Knight Term

28  Sheet, the Alleged Contract contemplated future permanent "**financing raising at**

**least $15mm at a pre-money valuation in excess of $85mm"** subject to a shareholder vote.  Id.

37.     On June 27, 2016, OCM sent an email to Minor, copying Laggner, urging Minor to immediately sign the Alleged Contract:  "Can you scan me your executed signature pages?  We'll need this signed before the Board meeting today at **10am PST**."  (Ex. G).  Minor signed the document and followed up very shortly thereafter with an email to ensure that there was no misunderstanding, given the rush and the vagueness of, among others, the terms "next financing" and "approval" used in the Alleged Contract drafted by Laggner and OCM.  Minor's email to OCM, with a copy to Laggner, made it absolutely clear that Laggner and OCM would have to deliver a viable financing alternative to the Salinas Loan acceptable to the Board in order to get his shares:

> Dave I received your $1.  **I want to be clear that this agreement is predicated on your delivering the alternative plan to Salinas.**  I'm more (sic) happy to be the party to pay for your work but I do want it made clear, particularly given the exceptional swiftness of your execution of an agreement, that there is a quid pro quo at work here.

(Ex. H, emphasis added).  OCM did not respond to Minor's email, but Laggner did.  Acknowledging Minor's understanding, Laggner stated, "Halsey, I sent you $1 as well and we will present the offer this **evening** to the board."  Id. (emphasis added).

38.     The next day, on June 28, 2016, Laggner sent an email to Minor asking Minor to have his trustee sign the Alleged Contract:  "Halsey, Dave and I wanted to see if your trustee could review and sign the SPTV [i.e., the Alleged

-14-

FOURTH AMENDED COMPLAINT

1   Contract] as well.  We have a feeling this will be required on board call **this**

2   **evening**."  (Ex. I, emphasis added).

3       39.    Minor's trustee did not sign the Alleged Contract until June 29, 2016.

4   After the trustee (Robert) sent his signature page to Minor, OCM and Laggner,

5   OCM stated:  "Thanks, Robert.  Your speedy turnaround will help with the

6   **upcoming Board meeting**."  (Ex. J, emphasis added).

7       40.    One month later, on July 26, 2016, Laggner sent an email to Minor

8   claiming that he and OCM submitted their "financing offer" to the Board on June

9   24, 2016.  (Ex. K).  Thus, on information and belief, despite their cries of urgency

10  for Minor to sign the Alleged Contract for a Board meeting at 10 a.m. on June 27,

11  2016, OCM and Laggner's emails suggest that they did not present their "financing

12  offer" to the Board at that time – either it had already been presented and rejected

13  or it was presented days later (if at all) and rejected.

14      41.    Though neither Laggner nor OCM told Minor contemporaneously,

15  Minor learned much later – in late July 2016 – from several members of the Board

16  (Adrian Steckel, Tim Parsa, and Juan Pablo Thieriot) that the Board flatly rejected

17  OCM and Laggner's financing offer as not being credible, recognizing that it was a

18  sham since OCM and Laggner failed to demonstrate that they had committed

19  investors or the ability to come up with the financing they purported to "offer" the

20  Company, contrary to what they had represented to Minor.  The Board did not even

21  consider it a formal offer or, on information and belief, even a presentation to the

22  Board, because it was so frivolous.  Contrary to what Laggner and OCM

23  represented to Minor to induce him to sign the Alleged Contract, the Board did not

24  believe that Laggner and OCM had secured any viable financing.  The Board was

25  right.

26      42.    Thereafter, in late June and July of 2016, Laggner and OCM

27  repeatedly represented to Minor that they would continue to work on a viable

28

SHUMENER, ODSON &
OH, LLP

-15-

FOURTH AMENDED COMPLAINT

1    alternative to the Salinas Loan, and they continued to reaffirm their opposition to

2    the Salinas Loan (i.e., any financing negotiated between Salinas and the Company).

3            43.    On June 28, 2016, Minor sent an email to OCM and Laggner, stating:

4

5                    It's very clear that when discovery occurs there are going

6                    to be so many irregularities with this board if it's handed

7                    to Ricardo that likely all of the board members supporting

8                    Ricardo will be found to have breached their duties.

9

10                   I would make this clear.  I'm sure Dave and our counsel

11                   can back this up.

12

13   (Ex. L).  Confirming his agreement with Minor that the Salinas Loan would be

14   detrimental to the Company, OCM responded for itself and Laggner that, "**We've**

15   intimated as much already.  I think they're beginning to understand our capital is

16   not their playpen."  Id.  (emphasis added).

17           44.    On June 29, 2016, Minor sent an email to OCM and Laggner, asking,

18   "Are there any investors other th[a]n Salinas recommending his offer?  I realize the

19   shareholders he has offered jobs support him but are there any people who are

20   actual investors seeking his proposal?"  Again, agreeing with Minor's position

21   opposing the Salinas Loan, OCM responded, "Not that I know of."  (Ex. M).

22           45.    Thus, even after OCM and Laggner supposedly presented their

23   "financing offer" to the Board, OCM and Laggner continued to represent to Minor

24   that they opposed the Salinas Loan and were working to avoid it.

25   //

26   //

27   //

28

SHUMENER, ODSON &
OH, LLP

-16-

FAC000016

**OCM and Laggner Fraudulently Conceal Conduct Supporting Salinas Loan**

46.     On July 11, 2016, Laggner sent an email to Minor, stating:

> …Adrian called me last night with more of the same BS.
> I made it clear that the board is conflicted while the
> company needs little capital the next 60 days **without**
> **Salinas like strings**.  He thinks the bullying strategy
> works but I'm not falling for it.

(Ex. N, emphasis added).

47.     On July 21, 2016 at 12:12 p.m., OCM suddenly sent an email to Minor, stating:

> [W]e've won substantial improvements to terms vs. the
> original cram-down financing proposal … still negotiating
> for more.  Board will be voting on final terms of a B-2
> preferred soon.

> One pressing item in moving forward:  new management
> (CEO, and decent finance/control people).  Any ideas?

(Ex. O).  Although Minor later discovered that this email referred to the Salinas Loan, he had no reason to think that at the time.  Indeed, OCM and Laggner were supposed to be working on an *alternative* to the Salinas Loan.  Nowhere in OCM's email does he mention the Salinas Loan.  Instead, OCM's reference to "new management" made it seem like he was referring to the White Knight Term Sheet, which contemplated the appointment of new management.  Thus, Minor had no

SHUMENER, ODSON &
OH, LLP

-17-

FOURTH AMENDED COMPLAINT

FAC000017

1    reason to think that OCM was referring to the Salinas Loan; to the contrary, OCM

2    was again purposely and deceptively vague.

3         48.    In fact, Minor responded to OCM's email, copying Laggner:

4

5              That's good to hear.  I think we have a great candidate for

6              CEO thanks to Bill.  He is also the kind of guy who won't

7              deliver surprises.  We need desperately need [sic] a CEO

8              and then everything will take care of itself.

9

10   (Ex. O).  Neither Laggner nor OCM responded to Minor's email.

11        49.    OCM's July 21 email failed to indicate that the Board's vote either

12   already had taken place or was taking place that day, thereby depriving Minor of

13   the opportunity to stop the Salinas Loan.

14        50.     Instead, that night, on July 21, 2016, OCM simply forwarded to

15   Minor the Company's notice to shareholders.  (Ex. W).  The notice disclosed that

16   the Board of the Company had already voted to proceed with the Salinas Loan.

17   And contrary to OCM's prior attempt to paint a rosy picture of the veiled Salinas

18   Loan, a shareholder of the Company later, and rightly, described that Salinas Loan

19   as "**Brutal**" – which captured it all.  (Ex. X).  Although OCM and Laggner claim

20   that they were "negotiating" financing that was later discovered to be the Salinas

21   Loan, it is unclear whether OCM and/or Laggner "negotiated" anything, especially

22   given the unfavorable terms of the Salinas Loan.

23        51.    Minor responded the next day, July 22, 2016, stating in an email to

24   Laggner and OCM:

25

26             Can one of you call me to explain the email I received

27             from another shareholder regarding a rights offering for

28             $15 mm.  This is not consistent with any conversation we

1    have had to date and I want to understand why this

2    direction was chosen.

3    (Ex. P).

4    52.   Recognizing that, with the Board's approval of the Salinas Loan,

5    Laggner and OCM could not perform their end of the bargain under the Alleged

6    Contract, Minor sent another email dated July 22, 2016 to Laggner and OCM, and

7    concurrently returned the $1 paid by each of Laggner and OCM.  In that email,

8    Minor stated:

9

10   Guys I'm very sorry for all shareholders this process did

11   not work out as we hoped.  I have returned the value

12   previously transferred.  Thanks.

13

14   (Ex. Q).  Laggner accepted the return of the $1.  (Exs. R-S).

15   53.   In response, OCM demanded that Minor convey his shares of stock to

16   OCM and Laggner under the Alleged Contract, even though they facilitated the

17   very financing that they had promised to avoid.

18   54.   On July 22, 2016, Minor sent an email to OCM and Laggner, stating:

19

20   Dave, so I can better understand your position what do

21   you believe you did for me personally that was worth

22   14% of the fully diluted value of uphold?

23

24   In the rush I was VERY clear in conversation and later in

25   my email to you when you transferred $1 that there was

26   an expectation that we had with respect to receiving my

27   shares that was directly tied to achieving a very favorable

28

SHUMENER, ODSON &
OH, LLP

FOURTH AMENDED COMPLAINT

FAC000019

outcome for all shareholders resulting in deminimus [sic]

dilution.

What I'm struggling with is understanding what you

perceive to be the quid pro quo between such a large

amount of stock and the outcome for me as a shareholder?

(Ex. T).

55.     Also on July 22, 2016, Minor sent an email to Laggner and OCM, stating:

Bill/Dave I want you both to know that I am rescinding

the voting rights agreement.

Obviously things have turned out dramatically different

from what has been discussed, which was a small amount

of money bridging to a traditional round, and I need to be

able to vote my stock with Robert based on the new

realities I face.

Thanks.

(Ex. U).

56.     OCM and Laggner's response was to go behind Minor's back and ask the Company transfer Minor's shares to them under the Alleged Contract.

57.     Also behind Minor's back – prior to the Board's vote, neither Laggner nor OCM disclosed to Minor that a vote was being taken by the Board for approval of the Salinas Loan on July 20 or 21, 2016.

58.     Worse, neither Laggner nor OCM disclosed to Minor that, rather than fulfilling their promises to obtain an "alternative" to the Salinas Loan and "avoid the Salinas putch (sic)," OCM and/or Laggner purportedly were negotiating the

terms of the Salinas Loan and Laggner – a member of the Board – had voted *for* the Salinas Loan.

59.     Minor did not find out that Laggner voted for the Salinas Loan until much later, during litigation in South Carolina.  Indeed, OCM and Laggner filed an action in the United States District Court, District of South Carolina, Charleston Division, Case No. 2:16-cv-3684-RMG (the "**SC Action**")[2], during which they filed the "Minutes of the Meeting of the Board of Directors of BitReserve Ltd" dated July 20, 2016 (the "**Minutes**") under direct order by the Court.[3]  (Ex. V).  The Minutes revealed to Minor, for the first time, that Laggner "participated" in the Board meeting and that the Board "**unanimously**" approved the Salinas Loan.  Id. (emphasis added).  Thus, OCM and Laggner claim to have secretly negotiated the terms of the Salinas Loan and Laggner voted for the Salinas Loan, in derogation of their obligations to present secured alternative financing which would avoid the Salinas Loan – *i.e.*, the Salinas putsch.  OCM and Laggner knew that once the Salinas Loan was approved, the qualified financing referred to in the Alleged Contract – i.e., permanent "**financing raising at least \$15mm at a pre-money valuation in excess of \$85mm**" – would never occur, and the Alleged Contract would require Minor to vote his shares with the vote "recommended by the majority of the Board" forevermore.  Indeed, the "Voting of Shares" provision of the Alleged Contract requires Minor to vote this way "until such time as BitReserve has completed a financing raising at least \$15mm at a pre-money valuation in

---

[2] The SC Action was dismissed for, *inter alia*, lack of jurisdiction as to Minor.

[3] Laggner and OCM conspicuously failed to file the Board's meeting minutes concerning their own late June and/or early July 2016 financing pitch to the Board in response to the Court's order in the SC Action.  If such minutes exist at all – i.e., if there was such a presentation to the Board (which is doubtful) – then, upon information and belief, these minutes are in Laggner and/or OCM's possession and reflect the Board's determination that Laggner and OCM's White Knight Term Sheet financing "offer" lacked any real financing commitment and/or was neither viable nor credible.

FOURTH AMENDED COMPLAINT

SHUMENER, ODSON & OH, LLP

FAC000021

excess of $85mm" – an event that would never occur once the Salinas financing was put in place.

60.     After the vote had taken place, OCM went behind Minor's back and, in secret, demanded that the Company deliver Minor's shares to OCM and Laggner, using the vote for the Salinas Loan as the pretext for the demand.  Although Laggner and OCM had a duty to disclose these facts to Minor, they actively concealed them.

61.     Laggner and OCM owed fiduciary duties to Minor by virtue of, *inter alia*, (i) their representations to Minor that they would be taking the actions reasonably necessary to obtain Board approval of a financing alternative to the Salinas Loan that would enable the Company to avoid the Salinas Loan, (ii) Laggner and OCM's agreement to act as Minor's brokers and agents under the Alleged Contract, and (iii) Laggner's position as a Board member vis-à-vis Minor as a shareholder.  Furthermore, Laggner and OCM had exclusive knowledge of the information that they concealed, and many of the concealed facts stemmed from or were related to partial representations rendered false due to their incompleteness.

62.     In any event, approval of the Salinas Loan was never the deal.  As acknowledged in OCM's June 24, 2016 email, the very purpose of the Alleged Contract was to "avoid" the Salinas Loan, not consummate it.

63.     The "next financing" referred to in the Alleged Contract was not and could not have been the Salinas Loan.  Instead, the "next financing" referred to a small bridge loan – like that reflected by the White Knight Term Sheet – that would give the Company time to raise reasonable permanent financing instead of being forced to accept predatory terms (like the Salinas Loan) under duress.  Any other interpretation would render the Alleged Contract's "Voting of Shares" provision meaningless; that provision states:

-22-
FOURTH AMENDED COMPLAINT

FAC000022

1
2
3
4
5
6
7

> **VOTING OF SHARES**.  Seller agrees to vote his and
> any of his affiliates **remaining** shares in BitReserve Ltd.
> according to the vote recommended by the majority of the
> Board of Directors of BitReserve, Ltd. **until** such time as
> BitReserve has completed a financing raising at least
> **$15mm at a pre-money valuation in excess of $85mm**.

8    (Ex. F, emphasis added).  If the Alleged Contract contemplated the transfer of

9    shares upon approval of a permanent loan, then there would be no need for Minor

10   to vote "remaining" shares (i.e., Minor's shares not transferred to OCM and

11   Laggner at the time of the bridge financing) a certain way until a qualified

12   permanent loan was approved.  Thus, even if Laggner and OCM's

13   misrepresentations are set aside, the Salinas Loan could not have been the "next

14   financing" because it was not a small bridge loan, and it was not subject to a

15   shareholder vote.

16        64.    On its face, the Alleged Contract could be reasonably susceptible to

17   several other interpretations of "next financing" as well.  OCM and Laggner

18   purposely drafted the Alleged Contract using vague language like "next financing"

19   and claimed that there was a rush for Minor to sign it, knowing that Minor

20   understood "next financing" to mean a viable financing *alternative* to the Salinas

21   Loan that OCM and Laggner would bring to the Company.

22        65.    For example, the "Voting of Shares" provision might suggest that the

23   "next financing" had to meet the criteria specified therein.  Under that

24   interpretation, the Salinas Loan could not have been the "next financing" either,

25   since it did not meet the specified criteria; among other reasons, the Salinas Loan

26   valued the Company at far less than $85 million.

27        66.    Alternatively, the Alleged Contract is also reasonably susceptible to an

28   interpretation that the Board *must* approve the "next financing" proposal presented

to it to trigger the transfer of shares – i.e., if and only if the Board approves whatever "financing" is presented to it next in time will Laggner and OCM receive Minor's shares.  Under this interpretation, the "next financing" could not have been the Salinas Loan because OCM and Laggner claimed to have made a "financing offer" to the Board right after the parties executed the Alleged Contract.  According to this interpretation, since OCM and Laggner's financing "offer" was rejected, the "next financing" was not approved.

67.     Since the term "next financing" is vague and reasonably susceptible to multiple interpretations, extrinsic evidence must be considered.  The emails, including Minor's email stating his understanding, all confirm that "next financing" meant a viable financing *alternative* to the Salinas Loan that OCM and Laggner would bring to the Company.  This does not contradict any of the terms of the Alleged Contract.  Quite the contrary, it is the only interpretation of "next financing" that gives meaning to the "Voting of Shares" provision, and it is consistent with the parties' understanding reflected in numerous emails at that time. (Exs. A-U, X-Z).

68.     Indeed, Defendants promised Minor that they would formalize a small bridge loan like the loan contemplated by the White Knight Term Sheet, and the Board's acceptance was a condition precedent to the transfer of Minor's shares. That condition never occurred.  Nevertheless, after Laggner and OCM failed to convince the Board to vote for an alternative to the Salinas Loan, they suddenly argued that $1 was all that was required from each of Laggner and OCM to obtain 4,843,890 shares of common stock that Minor held in the Company – that for $1, each of Laggner and OCM were to obtain millions of dollars' worth of Minor's common stock.  There was never a meeting of the minds as to this *post hoc*, unconscionable re-write of the Alleged Contract.

69.     One dollar in exchange for millions of dollars' worth of stock and a surrender of voting rights (pending qualified permanent financing) constitutes a

1  gross disparity in consideration that shocks the conscience, rendering the Alleged
2  Contract unconscionable under Laggner and OCM's interpretation.  The Alleged
3  Contract is further unconscionable as, among other reasons, it was entered into
4  based on fraud.

5     70. If the Alleged Contract is a contract, then defendants Laggner and
6  OCM materially breached the express and implied covenants of the Alleged
7  Contract.  For example, the Alleged Contract states, in the "**Further Assurances**"
8  provision, that:

9

10     The parties agree … to take such further actions as may
11     be reasonably necessary to carry out the purposes and
12     intent of this Agreement.

13

14  (Ex. F).  The purposes and intent of "this Agreement" were to avoid the Salinas
15  Loan through a smaller bridge loan like that contemplated by the White Knight
16  Term Sheet, subject to a shareholder vote.  Instead, OCM claims in its July 21,
17  2016 email that OCM and Laggner had been negotiating the terms of the Salinas
18  Loan, not avoiding it, and the Minutes of the Board meeting that Laggner and OCM
19  filed in the SC Action establish that Laggner voted for the Salinas Loan.  Thus, in
20  breach of an express covenant of the Alleged Contract and the implied covenant of
21  good faith and fair dealing, neither OCM nor Laggner took "such further actions as
22  may be reasonably necessary to carry out the purposes and intent of this
23  Agreement," and undermined the very purpose of the Alleged Contract – *i.e.*, to
24  "avoid the Salinas putch (sic)."
25  //
26  //
27  //
28  //

SHUMENER, ODSON &
OH, LLP

-25-
FOURTH AMENDED COMPLAINT

FAC000025

**FIRST CAUSE OF ACTION**

**(Rescission – Fraudulent Inducement)**

71.     Minor hereby realleges and incorporates by reference paragraphs 1 through 70 as if set forth fully herein.

72.     Minor seeks to rescind the Alleged Contract based upon Laggner's and OCM's fraudulent inducement.

73.     Laggner and OCM – on behalf of themselves and each other – made false representations to Minor (i) that they did not believe the Salinas Loan (i.e., **any** financing negotiated between Salinas and the Company) would benefit the Company, given, among other things, Salinas' predatory practices; (ii) that they would work together on Minor's behalf to avoid the Salinas Loan; and (iii) that they had secured third party financing for the Company that was viable and materially more favorable than the Salinas Loan.  The acts of OCM are attributable to Laggner, and the acts of Laggner are attributable to OCM, as they were engaged in a joint venture and/or conspiracy with respect to the acts alleged herein.

74.     Laggner and OCM knew or should have known that these representations were false when made.  As the Board found, their financing was a sham.  And as Minor later discovered, OCM and Laggner claim to have been secretly negotiating the Salinas Loan, and Laggner voted *for* the Salinas Loan.

75.     Laggner's and OCM's representations were made with the intent to induce Minor to enter into the Alleged Contract.

76.     As a result of and in justifiable reliance on Laggner's and OCM's material misrepresentations, Minor was induced to enter into the Alleged Contract.

77.     As a result of Laggner's and OCM's fraudulent inducement, Minor is entitled to rescind the Alleged Contract and to the restitution of monetary losses that he sustained, in an amount to be proven at trial, which Minor is entitled to recover in addition to rescission.

## SECOND CAUSE OF ACTION

### (Rescission – Failure of Condition Precedent)

78.     Minor hereby realleges and incorporates by reference paragraphs 1 through 77 as if set forth fully herein.

79.     Minor seeks to rescind the Alleged Contract based upon the failure of Laggner and OCM to satisfy conditions precedent to the Alleged Contract.

80.     Pursuant to the Alleged Contract, Laggner and OCM agreed to formalize a viable financing *alternative* to the Salinas Loan and to present that alternative to the Board.  In exchange, Laggner and OCM would get the *opportunity* to obtain 4,843,890 of Minor's shares in the Company.  Like any other brokerage agreement, the Alleged Contract contained a condition precedent to the transfer of said shares – the Board's approval of a financing alternative that would enable the Company to avoid the Salinas Loan.  Board approval was not a covenant or promise that Defendants made under the Alleged Contract; rather, it was a condition required to be met before any of Minor's shares would be transferred.

81.     The Alleged Contract contemplates the transfer of Minor's shares upon Board approval of the Company's "next financing".  On its face, the term "next financing" is vague and ambiguous.  Although Defendants claim that "next financing" referred to whatever "financing" happened to come next in time, "next financing" could not have been the Salinas Loan.  Indeed, "next financing" referred to a small bridge loan – like that reflected by the White Knight Term Sheet – that would give the Company time to raise reasonable permanent financing instead of being forced to accept predatory terms (like the Salinas Loan) under duress.  Any other interpretation would render the Alleged Contract's "Voting of Shares" provision meaningless; that provision states:

> **VOTING OF SHARES**.  Seller agrees to vote his and any of his affiliates **remaining** shares in BitReserve Ltd.

according to the vote recommended by the majority of the
Board of Directors of BitReserve, Ltd. **until** such time as
BitReserve has completed a financing raising at least
**$15mm at a pre-money valuation in excess of $85mm**.

(Ex. F, emphasis added).  If the Alleged Contract contemplated the transfer of shares upon approval of a permanent loan, then there would be no need for Minor to vote "remaining" shares (i.e., Minor's shares not transferred to OCM and Laggner at the time of the bridge financing) a certain way until a qualified permanent loan was approved.  Thus, even if Laggner and OCM's misrepresentations are set aside, the Salinas Loan could not have been the "next financing" because it was not a small bridge loan, and it was not subject to a shareholder vote.

82.   As alleged herein, the Alleged Contract could be reasonably susceptible to several other interpretations of "next financing" on its face.  OCM and Laggner purposely drafted the Alleged Contract using vague language like "next financing" and claimed that there was a rush for Minor to sign it, knowing that Minor understood "next financing" to mean a viable financing *alternative* to the Salinas Loan that OCM and Laggner would bring to the Company; thus, extrinsic evidence must be considered.  The emails, including Minor's email stating his understanding, all confirm that "next financing" meant a viable financing *alternative* to the Salinas Loan that OCM and Laggner would bring to the Company.  (Exs. A-U, X-Z).

83.   Thus, as conditions precedent to Minor's performance under the Alleged Contract, Laggner and OCM were to deliver to Minor the Board's approval of third-party financing for the Company (i) that would avoid the Salinas Loan and (ii) that would require a shareholder vote before any permanent financing could be approved.

-28-

FOURTH AMENDED COMPLAINT

FAC000028

84.    Laggner and OCM never satisfied any of these conditions precedent. To the contrary, OCM and Laggner purportedly negotiated the terms of the Salinas Loan and Laggner, as a member of the Board, voted for the Salinas Loan – in derogation of their promises to take the actions reasonably necessary to avoid the Salinas Loan.  And the Salinas Loan – a permanent loan – was never presented to the shareholders for a final vote; rather, preferred shareholders received a "notice" that the Salinas Loan had been approved, and the common shareholders did not even get notice.

85.    Laggner's and OCM's failure to satisfy these material conditions precedent to Minor's performance under the Alleged Contract entitles Minor to rescission of the Alleged Contract, as it is no longer possible – given the Board's approval of the Salinas Loan – for the conditions precedent to the Alleged Contract to be satisfied.

## THIRD CAUSE OF ACTION

### (Rescission – Unconscionability)

86.    Minor hereby realleges and incorporates by reference paragraphs 1 through 85 as if set forth fully herein.

87.    Minor seeks to rescind the Alleged Contract because, pursuant to OCM and Laggner's interpretation, it is void as unconscionable.

88.    OCM and Laggner claim that $1 was consideration for millions of dollars' worth of Minor's stock in the Company and a surrender of his voting rights until qualified permanent financing was approved.  Minor disagrees.  However, to the extent that the Alleged Contract is read to reflect such a deal, it is void as unconscionable.

89.    One dollar in exchange for the transfer of millions of Minor's stock in the Company (worth millions of dollars) and a surrender of his voting rights (pending qualified permanent financing) constitutes a gross disparity in

SHUMENER, ODSON &
OH, LLP

consideration that shocks the conscience, rendering the Alleged Contract unconscionable.

90.     The Alleged Contract is further unconscionable as, among other reasons, it was entered into based on OCM and Laggner's fraudulent misrepresentations.

91.     That the Alleged Contract is void as unconscionable entitles Minor to rescission of the Alleged Contract.

## FOURTH CAUSE OF ACTION

### (Fraud and Fraudulent Concealment)

92.     Minor hereby realleges and incorporates by reference paragraphs 1 through 91 as if set forth fully herein.

93.     Laggner and OCM made false representations to Minor (i) that they did not believe the Salinas Loan (i.e., **any** financing negotiated between Salinas and the Company) would benefit the Company, given, among other things, Salinas' predatory practices; (ii) that they would work together on Minor's behalf to avoid the Salinas Loan; and (iii) that they had secured third party financing for the Company that was viable and materially more favorable than the Salinas Loan.  No such financing had been secured by Laggner or OCM at the time, and both Laggner and OCM knew that that their representations to Minor were false when they made them.  The acts of OCM are attributable to Laggner, and the acts of Laggner are attributable to OCM, as they were engaged in a joint venture and/or conspiracy with respect to the acts alleged herein.

94.     Laggner and OCM knew or should have known that these representations were false when made.

95.     Minor justifiably relied upon Laggner's and OCM's material misrepresentations.

96.     As a result, Minor has sustained damages in an amount to be proven at trial.  By intentionally misrepresenting that they had secured a viable financing alternative to the Salinas Loan, Laggner and OCM induced and urged Minor to immediately enter into the Alleged Contract (which they drafted with purposely vague terms), causing Minor to believe that any delay in his execution of the Alleged Contract would prejudice the financing that they falsely represented they had secured.

97.     Thereafter, Defendants secretly worked to push the Salinas Loan to approval by, among other things, purportedly negotiating the Salinas Loan and voting in favor of it.  Through their misrepresentations, Laggner and OCM induced Minor to refrain from personally seeking or hiring someone else to seek a viable financing alternative and caused the Salinas Loan to be approved.  As a result, Minor's shares were diluted by fifty percent (50%).

98.     Furthermore, Laggner and OCM owed fiduciary duties to Minor by virtue of, *inter alia*, (i) their representations to Minor that they would be taking the actions reasonably necessary to obtain Board approval of a financing alternative to the Salinas Loan that would enable the Company to avoid the Salinas Loan, (ii) Laggner and OCM's agreement to act as Minor's brokers and agents under the Alleged Contract, and (iii) Laggner's position as a Board member vis-à-vis Minor as a shareholder.

99.     Notwithstanding their duties of disclosure to Minor, prior to the Board's approval of the Salinas Loan, Laggner and OCM concealed from and/or failed to disclose to Minor (i) that Laggner and/or OCM purportedly were involved in the negotiations of the terms of the Salinas Loan, (ii) that the Board was taking a vote on the Salinas Loan, (iii) that Laggner had actually voted *for* the Salinas Loan at the Board meeting on July 20 or 21, 2016, and (iv) that neither Laggner nor OCM had taken the actions reasonably necessary to avoid the Salinas Loan. Laggner and OCM had exclusive knowledge of the information that they concealed,

and many of the concealed facts stemmed from or were related to partial representations rendered false due to their incompleteness.  For example, although OCM – on behalf of itself and Laggner – claimed that they had "won substantial improvements to terms vs. the original cram-down financing proposal … still negotiating for more" and that the "Board will be voting on final terms of a B-2 preferred soon", OCM purposely omitted any reference to the Salinas Loan and that it was actually the Salinas Loan that was being voted on "soon".

100.   Once the vote had taken place, OCM went behind Minor's back and demanded that the Company deliver Minor's shares to OCM and Laggner, using the concealed vote for the Salinas Loan as the pretext for the demand.

101.   Minor justifiably relied upon Laggner's and OCM's duties to disclose these material facts to him and did not learn of these concealed/non-disclosed facts until after the Board had voted in favor of the Salinas Loan.

102.   As a result of Laggner's and OCM's fraudulent concealment, non-disclosures and material misrepresentations, Minor could not protect his interests in the Company and suffered damages in an amount to be proven at trial.  Thus, in addition to rescission, Minor is entitled to recover damages.

103.   The dilution of Minor's shares was a *direct result* of Laggner and OCM's breaches.  Defendants did not promise that the Company would never accept the Salinas Loan or that they would insure Minor against dilution, but they did promise to secure and formalize a viable financing *alternative* to the Salinas Loan and to make a formal presentation to the Board of such secured, alternative financing.  Instead, Defendants took no efforts to secure such financing and actually advocated for the Salinas Loan behind Minor's back.  As a direct and predictable result of Defendants' actions and inactions, Minor suffered monetary loss because his shares were diluted by fifty percent (50%).  Unlike the preferred shareholders, Minor – a common shareholder – was not offered an opportunity to avoid dilution. The common shareholders, who made up more than half of the Company at the

time, were left in the dark regarding the Salinas Loan and were excluded from participation in the Salinas Loan.

104.   Further, to the extent that the Alleged Contract is not rescinded, which it should be, Defendants' assistance in the passage of the Salinas Loan effectively deprived Minor of his vote.

105.   Had Minor known that OCM and Laggner did not have a viable financing alternative to the Salinas Loan in June 2016, he never would have signed the Alleged Contract; had Minor known that Defendants were not actually continuing to work on such financing thereafter, he would have hired someone else to do so or would have sought such financing himself and, on information and belief, would have raised financing on terms superior to the Salinas Loan; and had Minor known that Defendants were going to push the Salinas Loan to approval, he never would have agreed to sacrifice his vote.

106.   OCM and Laggner acted with oppression, fraud and malice toward Minor, and in reckless disregard of Minor's rights, entitling Minor to an award of punitive/exemplary damages.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)

107.   Minor hereby realleges and incorporates by reference paragraphs 1 through 106 as if set forth fully herein.

108.   The Alleged Contract is an agreement for Laggner and OCM to act as Minor's loan brokers.  Pursuant to the Alleged Contract, Laggner and OCM agreed to formalize a viable financing *alternative* to the Salinas Loan and to present that alternative to the Board.  In exchange, Laggner and OCM would get the *opportunity* to obtain 4,843,890 of Minor's shares in the Company.  Like any other brokerage agreement, the Alleged Contract contained a condition precedent to the transfer of said shares – the Board's approval of a financing alternative that would enable the

Company to avoid the Salinas Loan.  Board approval was not a covenant or promise that Defendants made under the Alleged Contract; rather, it was a condition required to be met before any of Minor's shares would be transferred.

109.   The Alleged Contract contemplates the transfer of Minor's shares upon Board approval of the Company's "next financing".  On its face, the term "next financing" is vague and ambiguous.  Although Defendants claim that "next financing" referred to whatever "financing" happened to come next in time, "next financing" could not have been the Salinas Loan.  Indeed, "next financing" referred to a small bridge loan – like that reflected by the White Knight Term Sheet – that would give the Company time to raise reasonable permanent financing instead of being forced to accept predatory terms (like the Salinas Loan) under duress.  Any other interpretation would render the Alleged Contract's "Voting of Shares" provision meaningless; that provision states:

> **VOTING OF SHARES**.  Seller agrees to vote his and any of his affiliates **remaining** shares in BitReserve Ltd. according to the vote recommended by the majority of the Board of Directors of BitReserve, Ltd. **until** such time as BitReserve has completed a financing raising at least **$15mm at a pre-money valuation in excess of $85mm**.

(Ex. F, emphasis added).  If the Alleged Contract contemplated the transfer of shares upon approval of a permanent loan, then there would be no need for Minor to vote "remaining" shares (i.e., Minor's shares not transferred to OCM and Laggner at the time of the bridge financing) a certain way until a qualified permanent loan was approved.  Thus, even if Laggner and OCM's misrepresentations are set aside, the Salinas Loan could not have been the "next financing" because it was not a small bridge loan, and it was not subject to a

1    shareholder vote.

2        110.   As alleged herein, the Alleged Contract could be reasonably

3    susceptible to several other interpretations of "next financing" on its face.  OCM

4    and Laggner purposely drafted the Alleged Contract using vague language like

5    "next financing" and claimed that there was a rush for Minor to sign it, knowing

6    that Minor understood "next financing" to mean a viable financing *alternative* to

7    the Salinas Loan that OCM and Laggner would bring to the Company; thus,

8    extrinsic evidence must be considered.  The emails, including Minor's email stating

9    his understanding, all confirm that "next financing" meant a viable financing

10   *alternative* to the Salinas Loan that OCM and Laggner would bring to the

11   Company.  (Exs. A-U, X-Z).

12       111.   Furthermore, in the Alleged Contract, Laggner and OCM expressly

13   "agree" and covenant "to execute such further documents and instruments and to

14   take such further actions as may be reasonably necessary to carry out the purposes

15   and intent of this Agreement."

16       112.   One of the implied covenants and "purposes" of the Alleged Contract

17   – indeed, the most important covenant and the primary purpose of the Alleged

18   Contract – was for Laggner and OCM to deliver a viable financing *alternative* to

19   the Salinas Loan.  This purpose is apparent in the parties' communications before,

20   at and after the time the Alleged Contract was signed.  And these communications

21   must be considered given the vagueness of, among other terms, "next financing".

22       113.   Thus, Laggner and OCM breached the express and implied covenants

23   of the Alleged Contract – to formalize a viable financing *alternative* to the Salinas

24   Loan and to present that alternative to the Board  – by, *inter alia*, (i) failing to

25   formalize a viable financing alternative that would avoid the Salinas Loan, (ii) on

26   information and belief, failing to present a viable financing alternative to the Board;

27   (iii) purportedly negotiating the terms of the Salinas Loan, (iv) failing to notify

28   Minor that the Board intended to meet to vote on the Salinas Loan on July 20 or 21,

SHUMENER, ODSON &
OH, LLP

FOURTH AMENDED COMPLAINT

FAC000035

2016, (v) voting for the Salinas Loan, and/or (vi) failing to take the actions reasonably necessary to carry out the purposes and intent of the Alleged Contract.

114.   Minor has duly performed all conditions, covenants, and promises required to be performed on his part under the Alleged Contract, except those which have been prevented, delayed, or excused by Laggner's and OCM's material breaches and other misconduct.

115.   As a direct and proximate result of Laggner's and OCM's material breaches of the Alleged Contract, Minor seeks rescission of the Alleged Contract and has suffered damages in an amount to proven at trial.  Indeed, Defendants' breaches were the proximate cause of the dilution of Minor's shares by fifty percent (50%).  It is precisely *because* Defendants failed to secure a viable alternative to the Salinas Loan and, instead, purportedly negotiated the Salinas Loan and voted in favor of the Salinas Loan behind Minor's back, while promising Minor that they were doing the exact opposite, that Minor suffered monetary loss via dilution of his shares by fifty percent (50%).

116.   Had Minor known that OCM and Laggner did not have a viable financing alternative to the Salinas Loan in June 2016, he never would have signed the Alleged Contract; and had he known that Defendants were going to push the Salinas Loan to approval instead of working to avoid the Salinas Loan thereafter, he would have hired someone else to do so and, on information and belief, would have raised financing on terms superior to the Salinas Loan.

117.   In addition to damages, Laggner's and OCM's material breaches of the Alleged Contract entitle Minor to rescission of the Alleged Contract.

//
//
//
//

## SIXTH CAUSE OF ACTION

### (Declaratory Relief)

118.   Minor hereby realleges and incorporates by reference paragraphs 1 through 117 as if set forth fully herein.

119.   After failing to secure and deliver viable third-party financing for the Company that was materially more favorable than the Salinas Loan, and after concealing that they had actually taken action to ensure that the Salinas Loan was approved rather than avoided, Laggner and OCM demanded that Minor deliver his shares in the Company to Laggner and OCM.

120.   An actual controversy has arisen between Minor, on one hand, and Laggner and OCM, on the other, concerning, among other things, the obligations, if any, under the Alleged Contract.  Minor contends that:

(a)   The Alleged Contract is unenforceable as a matter of Delaware law;

(b)   Conditions precedent to the Alleged Contract were the delivery of Board approval of a viable financing alternative to the Salinas Loan that would enable the Company to avoid the Salinas Loan altogether and that would require a shareholder vote before any permanent financing could be approved;

(c)   Laggner and OCM fraudulently induced Minor to enter into the Alleged Contract;

(d)   Laggner and OCM failed to deliver the requisite consideration, (*i.e.*, formalization and presentation to the Board of a viable third-party financing alternative to the Salinas Loan) and instead purportedly negotiated the Salinas Loan and voted *for* the Salinas Loan to create a pretext to argue that Minor's obligation to deliver his shares in the Company had been triggered;

(e)   The $1 was never the real consideration for the Alleged Contract, and it would be unconscionable for $1 to constitute adequate

consideration for 4,843,890 shares of Minor's stock (worth millions of dollars) in the Company;

(f)     Laggner and OCM fraudulently concealed from Minor (i) that OCM and Laggner purportedly were negotiating the terms of the Salinas Loan, (ii) that the Board noticed a meeting to vote on the Salinas Loan, (iii) that the Board had taken said vote, (iv) that Laggner, as a member of the Board, actually voted for the Salinas Loan at the Board meeting, and (v) that OCM used that vote as a pretext to demand that the Company transfer Minor's shares to OCM and Laggner;

(g)     The Board's rejection of Laggner's and OCM's financing "offer" and its subsequent approval of the Salinas Loan rendered it impossible for Laggner and OCM to perform under the Alleged Contract;

(h)     If Laggner and OCM contend that the Salinas Loan was the "financing" required to trigger Minor's obligation to deliver his shares in the Company to Laggner and OCM, then there was no meeting of the minds necessary to render the Alleged Contract a contract under Delaware law; and

(i)     If the Alleged Contract is a contract, Laggner and OCM breached the express covenants of the Alleged Contract as well as the implied covenant of good faith and fair dealing by, *inter alia*, purportedly negotiating the terms of the Salinas Loan, voting for the Salinas Loan at a Board meeting, and failing to take such further action as may be reasonably necessary to carry out the purposes and intent of the Alleged Contract.

121.   Minor is informed and believes, and thereon alleges, that Laggner and OCM dispute these contentions.

122.   Minor desires a judicial determination of the rights and duties of Minor, Laggner and OCM as to these opposing contentions.  Such a declaration is necessary and appropriate at this time so that the respective rights and obligations of the parties are resolved.

**PRAYER FOR RELIEF**

**WHEREFORE**, Minor prays for judgment as follows:

1.      For rescission of the Alleged Contract;

2.      For compensatory damages according to proof;

3.      For consequential damages according to proof;

4.      For punitive and/or exemplary damages according to proof;

5.      For declaratory judgment that:

(a)      The Alleged Contract is unenforceable as a matter of Delaware law;

(b)      Conditions precedent to Minor's performance under the Alleged Contract were the delivery of Board approval of a viable financing alternative to the Salinas Loan that would enable the Company to avoid the Salinas Loan altogether and that would require a shareholder vote before any permanent financing could be approved;

(c)      Minor owes Laggner and OCM nothing under the Alleged Contract;

(d)      Laggner's and OCM's purported payment of the nominal $1 is not the consideration required for Minor to deliver his shares in the Company to Laggner and OCM;

(e)      Laggner's and OCM's failure to meet conditions precedent, fraudulent inducement and/or failure of consideration relieve Minor of any obligation to deliver his shares in the Company to Laggner and OCM;

(f)      Laggner's and OCM's fraud and fraudulent concealment relieve Minor of any obligation to deliver his shares in the Company to Laggner and OCM;

(g)      The Board's rejection of Laggner's and OCM's financing

1  "offer" and the purported negotiation of the Salinas Loan and the vote for the

2  Salinas Loan establish that Laggner and OCM did not perform their part of the

3  bargain under the Alleged Contract;

4         (h)     Minor, Laggner and OCM never had a meeting of the minds

5  with respect to the terms upon which Minor was obligated to deliver his shares in

6  the Company to OCM and Laggner; and

7         (i)     If the Alleged Contract is a contract, Laggner and OCM

8  materially breached the express and implied covenants of the Alleged Contract.

9      6.     For attorneys' fees to the extent permitted by law;

10      7.     For costs of suit incurred herein; and

11      8.     For such other and further relief as the Court may deem just and

12  proper.

13   Dated:  October 29, 2018         SHUMENER, ODSON & OH LLP

14

15                                   By: */s/ Staci M. Tomita*

16                                    STACI M. TOMITA

17                                    Attorneys for Plaintiff
                                  HALSEY MINOR

18

19

20

21

22

23

24

25

26

27

28

-40-

FOURTH AMENDED COMPLAINT

FAC000040

## <u>DEMAND FOR JURY TRIAL</u>

Minor hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  October 29, 2018                SHUMENER, ODSON & OH LLP


By: */s/ Staci M. Tomita*
STACI M. TOMITA
Attorneys for Plaintiff
HALSEY MINOR

SHUMENER, ODSON &
OH, LLP

-41-
FOURTH AMENDED COMPLAINT

FAC000041